UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

JOEL G. FRANCKOWIAK, :
:
            Plaintiff, :
:
     v. : No. 5:16-cv-04480
:
CONAGRA FOODS, INC., :
:
            Defendant. :
_____

**O P I N I O N**
Defendant's Motion for Summary Judgment, ECF No. 37 - Denied

**Joseph F. Leeson, Jr.**                                                                                                                                     June 21, 2017
**United States District Judge**

**I.    Introduction**

       Joel G. Franckowiak claims that his former employer, Conagra Foods, Inc., terminated him because of his age, in violation of the Age Discrimination in Employment Act (ADEA) and the Pennsylvania Human Relations Act (PHRA). Conagra has moved for summary judgment. It contends that Franckowiak did not possess the objective knowledge and skills that Conagra requires of its maintenance managers and that he is therefore unable to make out a prima facie claim of age discrimination. Conagra also contends that even if Franckowiak can make out a prima facie claim of age discrimination, he has failed to present sufficient evidence for a jury to conclude that the legitimate reasons that it has offered for its employment decisions were a pretext to discriminate against him. Because the Court finds that Franckowiak has presented sufficient evidence for a jury to find in his favor, Conagra's motion is denied.

**II.    Background**

       The following facts are either undisputed or viewed in the light most favorable to Franckowiak, the non-moving party.[1]

**A.    Franckowiak's work at the Womelsdorf Plant and Conagra's 2013 acquisition of the plant**

      In 1971, Franckowiak began working for Linette Quality Chocolates ("Linette QC"), which at that time was a small, family-owned company. Def.'s Facts ¶¶ 3-4. In 1985, Linette QC

---
[1]    The facts are taken substantially from the parties' submissions.

promoted Franckowiak to the position of maintenance manager at its plant in Womelsdorf, Pennsylvania. Def.'s Facts ¶ 7. In 2000, Linette QC was acquired by Ralcorp Holdings, Inc. ("Ralcorp"). Def.'s Facts ¶ 10, after which Franckowiak was promoted to "maintenance manager slash plant engineer" for the Womelsdorf Plant. Pl.'s Dep. 26:8-9, ECF No. 37-7.

In January 2013, Conagra completed its purchase of Ralcorp for $4.95 billion. Def.'s Facts ¶ 12. As part of that sale, Conagra acquired the Womelsdorf Plant. Def.'s Facts ¶ 13. As an employee that Conagra inherited from its existing workforce, Franckowiak was neither hired nor promoted into his then-current position by Conagra. Def.'s Facts ¶ 15. After Conagra acquired the Womelsdorf Plant, Franckowiak's title changed slightly from "senior manager maintenance and engineering" to "manager plant engineering." Pl.'s Facts ¶ 15, ECF No. 40-2. Conagra employed Franckowiak from the time it acquired the Womelsdorf Plant in early 2013 until Franckowiak's discharge in February 2015. Def.'s Facts ¶ 14. At the time of Franckowiak's discharge, he was 61 years old. *See* Pl.'s Facts ¶ 1.

**B.  Franckowiak's job duties and chain of command**

When Franckowiak worked for Linette QC as the maintenance manager, he managed the maintenance department, handled environmental permitting, and purchased the parts for the maintenance department. Def.'s Facts ¶ 26. After Ralcorp's acquisition of the plant, Franckowiak was assigned the added responsibility of serving as the plant engineer on capital projects. Def.'s Facts ¶ 30. Later, after Conagra acquired the plant, Franckowiak was assigned responsibility for receiving parts that had been ordered. Def.'s Facts ¶ 31. In all, by 2015 Franckowiak was responsible for being the maintenance manager and plant engineer, as well as handling environmental permitting, purchasing parts, receiving parts, snow-plowing, and salting the parking lots. Pl.'s Facts ¶ 19.

As the maintenance manager, Franckowiak reported to the manager of the Womelsdorf Plant, Robert Bard. Def.'s Facts ¶ 18. Bard joined the Womelsdorf Plant as plant manager in late 2012, just prior to Conagra's acquisition of the plant. Def.'s Facts ¶ 19. Bard became a Conagra employee as a result of Conagra's acquisition of the Womelsdorf Plant. Def.'s Facts ¶ 20. During the relevant time period, Bard reported to Tim Lethcoe, the Vice President of Operations. Def.'s Facts ¶ 22. As the VP of Operations, Lethcoe supported numerous plants, including the Womelsdorf Plant. Def.'s Facts ¶ 24.

**C.  Maintenance management**

As maintenance manager, Franckowiak utilized a "paper-driven" maintenance program, which included drafting and tracking work orders by hand. Def.'s Facts ¶ 33. Prior to Conagra's acquisition of the Womelsdorf Plant, Franckowiak was never required to, or evaluated based on his ability to implement, a computerized maintenance management system or a computerized inventory management system. Def.'s Facts ¶¶ 39-40.

During its ownership of the Womelsdorf Plant, Ralcorp purchased a computerized maintenance management system ("CMMS") made by J.D. Edwards ("JDE"). Def.'s Facts ¶ 34.[2] The JDE CMMS is an on-line (or cloud-based) software solution that could be accessed by authorized users from any computer connected to Ralcorp's (and later, Conagra's) network, including the computers in the Womelsdorf Plant. Def.'s Facts ¶ 35.[3] From early on in his time with Ralcorp, Franckowiak was an authorized user with access to the JDE CMMS, and he regularly used the purchase-order system component of the JDE software. Def.'s Facts ¶¶ 36-37.[4] Franckowiak's access to and use of the JDE system for purchase-order purposes also included access to the system's maintenance program capabilities (e.g., the JDE work order system and equipment management system). Def.'s Facts ¶ 38.[5]

**D.   Preventive maintenance**

Lethcoe testified that, as part of their normal operations, Conagra's plants use data-driven preventive maintenance programs. Def.'s Facts ¶ 44.[6] During Franckowiak's employment as maintenance manager at Womelsdorf, the plant's maintenance department performed preventive maintenance based on Franckowiak's knowledge of machine use and based on a paper-based machine operator feedback system, rather than in accordance with any computerized data analytics. Def.'s Facts ¶ 45.

According to Lethcoe, in order to determine whether a plant's maintenance system is performing well, Conagra tracks and analyzes maintenance data as part of its normal operations. Def.'s Facts ¶ 46.[7] Certain maintenance data is referred to as maintenance Key Performance Indicators ("KPIs"). Def.'s Facts ¶ 47; *see* Pl.'s Resp. Def.'s Facts ¶ 47. Prior to Conagra's

---

[2]    Franckowiak disputes this asserted fact "to the extent Con[a]gra is suggesting that a CMMS system was provided to [Franckowiak] prior to [Franckowiak's] [October 2014] PIP [Performance Improvement Plan]" for aspects of his job other than purchase orders, "or that he was trained on such a system prior to his PIP." Pl.'s Resp. Def.'s Facts ¶ 34, ECF No. 40-1.
[3]    Franckowiak disputes this asserted fact because "during his employment with ConAgra, [he] was never informed about such an on-line (or cloud-based) software solution that could be accessed from any computer connected to Con[a]gra's network, and never trained on such a system prior to the PIP, except with regard to purchasing orders." Pl.'s Resp. Def.'s Facts ¶ 35.
[4]    Franckowiak does not dispute that he had access to JDE for purchase orders and receiving, but "disputes that [he] was ever informed or trained with regard to any broader uses of the JDE system prior to his [Performance Improvement Plan]." Pl.'s Resp. Def.'s Facts ¶ 36.
[5]    Franckowiak asserts that he "was never informed of such access and never provided training on the JDE system for its maintenance program capabilities, until his bogus [Performance Improvement Plan]." Pl.'s Resp. Def.'s Facts ¶ 38.
[6]    Franckowiak disputes Lethcoe's statement and asserts that the Womelsdorf Plant "did not implement or use a computerized data-driven preventative maintenance at the time [Franckowiak] was employed, despite [his] repeatedly requesting and suggesting the implementation of a computerized system for preventative maintenance." Pl.'s Resp. Def.'s Facts ¶ 44.
[7]    Franckowiak disputes Lethcoe's statement, asserting that although he "does not dispute what Con[a]gra may do at other plants not at issue in this lawsuit," with respect to the Womelsdorf Plant, "Con[a]gra did not begin tracking such information there until around late 2014, and did not provide him with any training, expectations or standards relating to same." Pl.'s Resp. Def.'s Facts ¶ 46.

acquisition of the Womelsdorf Plant, Franckowiak did not measure any maintenance performance metrics. Pl.'s Dep. 185:23-186:2, ECF No. 37-7.

According to Lethcoe, even before Conagra acquired the Womelsdorf Plant, Conagra required its maintenance managers to possess, among other things, the skills and knowledge necessary to: (1) implement a data-driven preventative maintenance program; (2) implement a computerized maintenance management system ("CMMS"); and (3) manage a maintenance department using key performance indicators by understanding, tracking, and utilizing relevant maintenance and production data. Def.'s Facts ¶ 50.[8]

### E. Franckowiak's 2013 performance review

In his 2013 performance review, Franckowiak received an overall rating of "Consistently Fulfills," which is the middle of five possible ratings.[9] 2013 Review, ECF No. 37-9. At the time of the 2013 review, Bard had been plant manager for eight months and Conagra had owned the plant for less than six months. Def.'s Facts ¶ 52; Pl.'s Resp. Def.'s Facts ¶ 52. Because of the incomplete transition from Ralcorp's systems to Conagra's systems, aspects of Franckowiak's scores in the 2013 review were tied to the performance of the plant's management team as a whole. Def.'s Facts ¶ 53; Pl.'s Resp. Def.'s Facts ¶ 53. In the 2013 performance review, Bard instructed Franckowiak to put into place a computerized maintenance management system, to use data to manage parts inventories, worker orders, and labor allocation, and to update his knowledge and application of maintenance leadership. Def.'s Facts ¶ 54.

### F. Bard's alleged discussion with Franckowiak concerning Bard's plans to retire

According to Franckowiak, in the early summer of 2014, Bard made comments to Franckowiak about his (Bard's) retirement plans during a discussion about investments. Def.'s Facts ¶ 63. Specifically, Franckowiak testified that Bard said the following: "I don't know what your plans are, by 55 I plan on being laying [sic] on the beach somewhere." Def.'s Facts ¶ 64. According to Franckowiak, he replied to Bard that he did not plan to retire until he was at least 66. Def.'s Facts ¶ 65; Pl.'s Resp. Def.'s Facts ¶ 65.

### G. Franckowiak's 2014 Performance Management Process ("PMP") review

Conagra's Performance Management Process ("PMP") evaluates its managerial employees based on their performance over Conagra's fiscal year, which runs from June 1 to May 31. Def.'s Facts ¶ 68. According to Robbyn Linville, who served as Conagra's Director of Human Resources from 2013 to 2016, because of the change in ownership of the Womelsdorf

---

[8] Franckowiak disputes Lethcoe's statement, asserting that the "principal qualifications, duties and responsibilities of [his] position (and that of his successor) did not include these requirements," and observing that Conagra's official written job description of the maintenance manager position does not include the items listed by Lethcoe. Pl.'s Resp. Def.'s Facts ¶ 50.

[9] The five possible ratings are as follows: Unsatisfactory, More is Expected, Consistently Fulfills, Exceeds Expectations, and Exceptional. *See id.*

Plant, FY 2014 was the only year when Franckowiak's evaluation occurred under Conagra's PMP system. Def.'s Facts ¶ 70; Linville Aff. ¶ 7, ECF No. 37-8.

According to Linville, as part of the PMP employees are provided goals at the start of a fiscal year and then, at the end of the fiscal year in June, are assigned a rating for each of the goals, as well as an overall rating. Def.'s Facts ¶ 73. Linville testified that for the FY 2014 PMP, there were five possible ratings, based on whether the employee met his or her expectations: "Meets," "Meets +" ("Meets Plus"), "Meets–" ("Meets Minus"), and two other ratings that were available but rarely used. Def.'s Facts ¶ 74.[10]

In summer 2014,[11] Bard completed Franckowiak's FY 2014 PMP, giving Franckowiak an overall rating of "Meets–".[12] 2014 FY PMP, ECF Nos. 37-10, 37-11. In addition to this overall rating, Franckowiak received five "Meets–" ratings and two "Meets" ratings for his seven objectives. *Id.* In the review, Bard instructed Franckowiak to benchmark best practices with other plants, to improve his preventative maintenance system, to employ servant leadership, and to implement measurable and sustainable changes in maintenance. Def.'s Facts ¶ 77. Bard's concluding comments in the review are as follows:

> Joel did meet expectations in his implementation of [several] key initiatives . . . . FY14 was a challenging year for the team, as we experienced significant first pass quality issues coupled with a huge spike in Costco demand, the induction of new team members, and unfavorable plant performance. Joel was able to navigate through this adversity and keep his team afloat. However in FY15 Joel must implement measurable and sustainable change in maintenance to build a long term foundation for plant success. The underlying theme to Joel's performance expectations in the coming year is to deliver results. He has my full confidence and support in driving this change.

2014 FY PMP.

## H. The August 2014 Conagra Performance System ("CPS") team visit

The Conagra Performance System ("CPS") is Conagra's continuous improvement system that identifies the various "pillars" that make up a successful production plant and assigns a leader to each pillar who is responsible for tracking and driving improvement in the KPI data for that pillar. Def.'s Facts ¶ 95. In August 2014, a team of Conagra CPS experts came to

---

[10] Franckowiak disputes this statement and contends that Conagra's performance evaluation rating had five numerical options (one through five). Pl.'s Resp. Def.'s Facts ¶ 74. Franckowiak cites Lethcoe's testimony that there were five possible numerical ratings, based on whether an employee met expectations. Lethcoe Dep. 17:25-18:14, ECF No. 37-15. He further cites Lethcoe's testimony that he could not recall seeing anyone give a rating of "meets plus" or "meets minus." Lethcoe Dep. 19:15-18..

[11] Conagra contends that Franckowiak's evaluation was completed by July 18, 2014. Def.'s Facts ¶ 83. Franckowiak disputes this, asserting that the evaluation was not communicated to him until August 18, 2014.

[12] Franckowiak acknowledges that his 2014 review included a "–" mark, but he disputes that this notation "had any true significance." Pl.'s Resp. Def.'s Facts ¶ 75.

5

Womelsdorf to try to help the plant with problems it was experiencing. Def.'s Facts ¶ 96; Pl.'s Dep. 192:20-23.

Following the visit, John Munjas, a member of the CPS team, sent to Bard a draft report of the results of the visit. *See* Pl.'s Resp. Def.'s Mot. Ex. GG, ECF No. 40-36. The draft report identified several tasks for which Womelsdorf Plant employees were responsible and, for each task, identified a "target timing" for completion and a particular employee responsible for "accountability." *Id.*

Franckowiak was listed as the accountability employee for several tasks, including the requirement to "initiate PMs [preventive maintenance] on Line 6 enrober using Excel or JDE," with a target timing of August 22, 2014. *Id.* The draft report also listed several "key agenda items & discussion points" for various aspects of the plant. *Id.* With respect to maintenance, the report observed a "[l]ack of automated inventory & work order systems" and stated the following: "Plant expectations: work order system and PM [preventive maintenance] plan to be developed in the next 30 days." *Id.*

Franckowiak testified that, following the visit and the resulting report, he told Bard that he "didn't have the tools or the manpower" to implement a preventive maintenance program. Pl.'s Dep. 207:15-17. Bard testified that, as maintenance manager, Franckowiak was ultimately responsible for correcting the maintenance deficiencies identified in the CPS visit. Bard Dec. ¶ 19, ECF No. 37-14.

I. **Bard's alleged comments to Livinghouse and Hetrich**

In June of 2014, Conagra hired Colleen Livinghouse to serve as the safety and human resources manager at the Womelsdorf Plant. Def.'s Facts ¶ 160. Conagra eliminated her position in January 2015, and she does not feel she was treated fairly by Conagra. Def.'s Facts ¶¶ 162-63.

Livinghouse testified that, at some point during her employment, Bard called her and Ricky Hetrich, another Conagra employee, into Bard's office for a meeting and informed them that he wanted to terminate Franckowiak and Charles Rightmyer, a production supervisor at the Womelsdorf Plant, because they were not performing their jobs well, they were employees Bard had inherited from the original owners of the Womelsdorf Plant, they were "old dinosaurs" and the plant needed "fresh blood," and Franckowiak was paid a high salary that was almost as much as Bard's. Def.'s Facts ¶¶ 164-66. Livinghouse also testified that Bard told her and Hetrich that he wanted to place Franckowiak and Rightmyer on PIPs where there was no room for them to succeed. Def.'s Facts ¶ 168.

Livinghouse ultimately was not involved in the drafting, implementation, or administration of Franckowiak's PIP. Def.'s Facts ¶ 171. She did play a role in implementing Rightmyer's PIP, the contents of which, she testified, were essentially dictated to her by Bard, and she acknowledged that the requirements of Rightmyer's PIP were not so impossible that he could not meet them. Livinghouse Dep. 150:7-11, 197:8-18. She testified that she signed Rightmyer's PIP "only because [she] felt confidence with the dynamics of the situation knowing

6

that he was getting the right support coming from me to meet those expectations" and that she "fought tooth and hard [sic] to make sure that . . . Rightmyer would meet those expectations and be given that support that he needed to meet his expectation on his PIP, which he did." Livinghouse Dep. 31:1-6, 197:8-18.[13]

Bard denies that he ever made any comments referring to Franckowiak as an "old dinosaur," expressing an interest in bringing in "fresh blood," or stating his intent to implement PIPs that were intended to result in the discharge of either Rightmyer or Franckowiak. Def.'s Facts ¶ 176. Hetrich testified that he recalled a conversation he had with Bard and Livinghouse about Rightmyer, but he does not recall Bard saying anything about Franckowiak during the conversation, nor does he recall Bard stating that he wanted to terminate Franckowiak and Rightmyer, that they were old dinosaurs, or that he needed to replace them with fresh blood. Hetrich Dep. 25:22.

**J.      Franckowiak's October 2014 Performance Improvement Plan**

On October 14, 2014, Bard placed Franckowiak on a PIP. Def.'s Facts ¶ 109. Bard testified that he did so based on numerous shortcomings in the Womelsdorf Plant's maintenance program and Bard's belief that Franckowiak did not possess the necessary knowledge and skills to manage the program as expected by Conagra. Def.'s Facts ¶ 107.

According to Bard, he wrote the PIP with help from Robbyn Linville from human resources. Bard Dep. 142:20. Linville testified that she received a draft from Bard, but she "can't recall if [she] had feedback on it and sent it back or if it went straight to legal for advice." Linville Dep. 94:15-24. She further testified that she saw it as her role, in advising Bard on the PIP, "to check for reasonableness," to "ask questions to make it more specific," and to check or verify the facts asserted in the PIP "[t]o the degree that [her] knowledge would enable [her]" to do so. Linville Dep. 97:22-98:8.

Among the conclusions Bard included in Franckowiak's PIP were the following:
- Bard determined that Franckowiak had consistently demonstrated a lack of thorough knowledge of current industrial maintenance programs and practices, such as preventive maintenance, work order management, labor tracking, and computerized maintenance management systems. Def.'s Facts ¶ 111.

- Bard determined that Franckowiak had consistently demonstrated a lack of understanding regarding common plant and maintenance performance data and

---

[13] Rightmyer, who is a production supervisor at the Womelsdorf Plant and is the oldest member of the management team, was placed on a ninety-day performance improvement plan by Hetrich and Livinghouse in August 2014. Def.'s Facts ¶¶ 177-80. Hetrich testified that Rightmyer's PIP was ultimately "dropped" because he (Hetrich) and Livinghouse "didn't give [Rightmyer] a fair chance to complete it" because they failed to meet with Rightmyer on a regular basis. Hetrich Dep. 35:1-6, ECF No. 37-16. Hetrich testified that Bard informed him that the PIP was being dropped and that he was frustrated that Hetrich and Livinghouse "did not handle the PIP right and give [Rightmyer] the proper opportunity" to succeed on his PIP. Hetrich Dep. 36:1-13. Bard testified that at the conclusion of Rightmyer's PIP, he determined that Rightmyer should keep his job as a Conagra employee. Def.'s Facts ¶ 181. Rightmyer is still employed at the Womelsdorf Plant. Def.'s Facts ¶ 182.

7

metrics, having been unable to articulate, with data, the role of maintenance in overall plant performance. Def.'s Facts ¶ 113.

- Bard determined that Franckowiak had not provided effective leadership to improve the morale of his direct reports and had not taken the necessary steps with his team to bridge the gap in team expectations and communication. Def.'s Facts ¶ 116.

Bard testified that he administered the PIP with support from Linville. Def.'s Facts ¶ 118. Linville testified that her role in the administration of the PIP was to participate in meetings when her schedule permitted her to do so. Linville Dep. 108:9-11.

The PIP required Franckowiak to demonstrate significant improvement over the following 90 days, outlining nine objectives, each with their own due date, that he was required to complete or otherwise satisfy in order to establish that he met the standards relevant to his role. Def.'s Facts ¶ 120.

The objectives of the PIP were as follows:

1. Initiate a weekly one-on-one [meeting] with Robert Bard . . . to review progress of the PIP. Due date: October 24, 2014.

2. Demonstrate improved knowledge of current maintenance performance metrics by networking with other maintenance professionals within Con[a]gra Foods to gain a solid understanding of performance KPI's, determine best practices, and develop a daily, weekly[,] monthly data driven reporting for Womelsdorf to be presented to plant management. Due date: November 28, 2014.

3. Demonstrate improved knowledge of current maintenance programs and practices by networking with other maintenance professionals within Con[a]gra Foods to gain understanding of their programs and practices, determine best practices, and develop a detailed maintenance strategy and implementation plan for Womelsdorf to be presented to plant management. Due date: December 19, 2014.

4. Meet with each Con[a]gra Foods Womelsdorf hourly associate assigned to your department and your peer department leaders to discuss barriers they have to completing their work successfully as it relates to maintenance and towards improving communication as it relates to your deliverables. . . . Due date: November 14, 2014.

5. Based upon the results of the one-on-one meetings with your Team, identify the top 5 barriers to success. Meet with Robert Bard to discuss these and to ensure you have alignment on the top barriers. Due date: November 21, 2014.

6. Develop an action plan, with management support, using SMART [specific, measurable, attainable, relevant, and time-bound] goals to address these barriers so that the maintenance department runs more efficiently and with fewer

8

associate concerns. The plan should be developed with a servant leadership style to involve the maintenance associates in solution development and implementation. Due date: December 5, 2014. . . .

7. Develop, implement, and present to plant management a preventative maintenance program for Line 6 in the JDE CMMS system. Due date: November 21, 2014.

8. Successfully complete a shift communication hand-off process for the maintenance team that outlines performance, events that occurred on the shift, work left incomplete, PM and work order assignments, etc. This should include the KPI's and the effective communication that was cited during the associate one-on-one sessions. Due date: January 2, 2015.

9. Demonstrate effective, timely, and sustained management of the JDE PM program, labor management, and maintenance KPI's. Due date: January 12, 2015.

Franckowiak PIP, ECF No. 37-7.

Bard testified that the maintenance-specific objectives in the PIP were not new expectations but rather had already been communicated to Franckowiak and reflected Conagra's already-existing expectations for the management of a plant's maintenance department. Def.'s Facts ¶ 122. The leadership directives in the PIP were leadership-development strategies that Bard had used for years and that had been previously included in PIPs for other management employees at the Womelsdorf Plant at Bard's direction. Def.'s Facts ¶¶ 123-24.

Franckowiak testified that he was "shocked" that he was placed on a PIP and he asked Bard and Linville "when they thought [he] could do all this" with all of his other duties. Pl.'s Dep. 169:11-19. Franckowiak testified that he told Bard and Linville that he would do his best, Pl.'s Dep. 170:5, but that he would be unable to complete the PIP in a timely manner, Pl.'s Dep. 248:17-19.

### K. Franckowiak's staffing and workload

At various times during the PIP, Franckowiak asked Bard to hire additional employees to assist in managing the maintenance department. Def.'s Facts ¶ 188. In particular, Franckowiak asked Bard to hire someone in the position of "maintenance planner," Bard Dep. 202:14-15, and, following a visit to Conagra's plant in Hanover, Pennsylvania, informed Bard that the Hanover Plant had a separate employee performing that role, Pl.'s Dep. 302:12-304:4. Bard testified that although he recognized the need to hire a maintenance planner in the long term, he did not hire one due to budgetary constraints and his belief that he "needed to have a system to have that person planned in, and [the Womelsdorf Plant] didn't have that." Bard Dep. 206:24-207:5. Beginning around September or October 2014 until Franckowiak's discharge, Bard arranged for

a Conagra employee named Ann Gorey to assist Franckowiak with loading information into the computer. *See* Pl.'s Dep. 142:5-143:17, 231:8-9.

Jim Neiderer, who served as the maintenance manager for Conagra's Hanover Plant, testified that he and Franckowiak discussed the need for a maintenance planner to run the computerized maintenance program and that he (Neiderer) recommended that a planner be added at Womelsdorf . Neiderer Dep. 56:17-24, 68:13-69:2.

At various times during his PIP, Franckowiak expressed to Bard that he felt overwhelmed by his workload. Def.'s Facts ¶ 191. Bard testified that he believed the strain on Franckowiak's time was primarily due to his inefficiency and his failure to sufficiently prioritize his work tasks, to delegate to his subordinates, and to elevate issues to Bard as needed. Bard Dec. ¶ 48. Franckowiak testified that Bard knew that he was unable to delegate management-level tasks such as purchasing and receiving to union employees at the plant. Pl.'s Dep. 302:20-303:8.

**L.    Franckowiak's training**

Franckowiak testified that he was never trained on the implementation of data-driven maintenance programs or maintenance metrics. Pl.'s Dep. 186:13-19, 191:3-14. He acknowledged that he never requested training on any of the data-driven programs, but stated that this was because he was unaware of their existence. Pl.'s Dep. 186:21-187:2. Bard testified that he did not know whether, prior to his PIP, Franckowiak had received any JDE CMMS preventive maintenance training at Conagra. Bard Dep.182:23-183:1.

Beginning in 2010, during Ralcorp's ownership of the Womelsdorf Plant, Franckowiak and other maintenance managers and employees received regular invitations from Peter Maher, a senior systems analyst at Conagra,[14] to participate in trainings and discussions relating to JDE maintenance program systems. Def.'s Facts ¶ 194. Franckowiak occasionally attended these trainings. *Id.* Maher testified that as early as 2010 he was available to Franckowiak as a resource for training and guidance in utilizing the JDE CMMS. Maher Dec. ¶ 8.

Franckowiak testified that, around the time of his PIP, Maher came to Womelsdorf for a day or two and showed Franckowiak some of the programs that he used and how to do work orders and preventive maintenance tasks on the computer. Pl.'s Dep 211:4-20, 272:17-273:2. But after Maher left, Franckowiak continued to have difficulty with the preventive maintenance computer program. Pl.'s Dep. 211:20-212:7.

Bard testified that for managers at Franckowiak's level, training and skill acquisition occurs through visits to other plants and working with peer managers at those plants to learn and share best practices, self-taught training opportunities, or company sponsored training. Bard Dec. ¶ 50.

---

[14]    *See* Maher Dec. ¶ 2, ECF No. 37-18.

**M. PIP Results**

Franckowiak's ninety-day PIP period ended on January 12, 2015.

With respect to the first objective, requiring weekly meetings with Bard, Franckowiak testified that he failed to set up a meeting for the week of December 10, and he did not dispute Bard's assertion that he (Franckowiak) failed to set up a meeting for the week of January 9. Pl.'s Dep. 262:6-9; 265:4-14.

With respect to the second objective, requiring Franckowiak to demonstrate knowledge of current maintenance metrics and to develop a data-driven reporting process, Franckowiak testified that he did not complete these tasks because was not trained on how to do so. Pl.'s Dep. 225:3-16. As for the requirement to network with other maintenance personnel, Franckowiak testified that he went to Conagra's Lancaster and Hanover plants and met with personnel at those plants. Pl.'s Dep. 225:21-226:7.

With respect to the third objective, requiring Franckowiak to demonstrate improved knowledge of current maintenance programs and develop a detailed maintenance plan, Franckowiak submitted two documents that Bard determined failed to provide an adequate plan. Def.'s Facts ¶ 129.

With respect to the fourth objective, requiring Franckowiak to meet with his colleagues in order to improve communication in the maintenance department, Franckowiak testified that he met with his colleagues as directed, but did not recall if he did so before the November 14 deadline indicated on the PIP. Pl.'s Dep. 276:12-277:12. Bard concluded that Franckowiak had failed to seek a deeper understanding of his core leadership improvements, but Franckowiak testified that he disagreed with this conclusion and believed that he had fulfilled this goal. *See* Pl.'s Dep. 277:23-278:4.

With respect to the fifth objective, requiring Franckowiak to identify the top five barriers to his department's success and to exhibit servant leadership, Franckowiak testified that he did not recall if he discussed these barriers with Bard. Pl.'s Dep. 286:13-18. Bard testified that he determined that Franckowiak did not take sufficient initiative in exhibiting servant leadership during his PIP. Def.'s Facts ¶ 131.

With respect to the sixth objective, Bard determined that Franckowiak failed to provide a list of his own SMART goals by the December 4 deadline. Def.'s Facts ¶ 132. Franckowiak testified that he initially provided Bard a set of SMART goals, but Bard did not approve them, and that he then asked Linville for information about SMART goals and, after receiving the information, submitted a second list of SMART goals to Bard. Pl.'s Dep. 287:10-291:2.

With respect to the seventh objective, requiring Franckowiak to implement and present to plant management a preventive maintenance program for Line 6 in the JDE CMMS system, Franckowiak testified that in October 2014 he participated in weekly preventive maintenance meetings with Peter Maher. Pl.'s Dep. 273:3-6. He further testified that he worked with Maher and Ann Gorey to enter the plant's machines into the JDE CMMS system. According to Franckowiak, he would handwrite the entries for each machine and Gorey would load them into

the JDE system. Pl.'s Dep. 292:1-294:24. Franckowiak acknowledged that during his PIP he never demonstrated to Bard or anyone else that he knew how to enter machines in the JDE system. Pl.'s Dep. 294:11-15. Bard acknowledged that Franckowiak was making progress on this objective, but he was concerned that Franckowiak "didn't really know the inner working" of the JDE system and therefore would be unable to detect if Gorey made any errors. Bard Dep. 204:1-9. Bard therefore determined that Franckowiak had not achieved the objective. Bard Dep. 204:12-15.

With respect to the eighth objective, requiring Franckowiak to complete a shift communication handoff process for the maintenance team that would include KPIs, Franckowiak testified that he established a process for the maintenance team to use a whiteboard to communicate from shift to shift. Pl.'s Dep. 295:5-8. He did not, however, recall if KPIs were ever included on the whiteboard. Pl.'s Dep 298:20-299:1. Bard testified that although he was "pleased with the whiteboard itself," it "did not include any metrics" and therefore did not meet the objective. Bard Dep. 205:1-12.

With respect to the ninth objective, requiring Franckowiak to demonstrate effective management of the JDE preventive maintenance program, labor management, and maintenance KPIs, Franckowiak testified that he completed the JDE program but not the labor management program, and he did not recall if he completed the KPIs. Pl.'s Dep. 299:17-300:8. Bard testified that he concluded that Franckowiak did not meet this objective. Bard Dep. 205:13-16.

Bard testified that he kept his boss, Tim Lethcoe, up-to-date on the status and progress of Franckowiak's PIP during their regular one-on-one meetings. Bard Dec. ¶ 24. Lethcoe testified that he is "sure that at some point [he and Bard] discussed how [Franckowiak] was doing against his PIP," although he cannot recall a specific conversation they had on this topic. Lethcoe Dep. 41:2-19.

### N.    Bard's departure from Conagra, the transition of the administration of Franckowiak's PIP to Tim Lethcoe, and Franckowiak's discharge

In January 2015, Bard accepted an offer to take a more senior position with another chocolate manufacturer. Def.'s Facts ¶ 141.

Lethcoe testified that around the time of Bard's resignation, he spoke with Bard by telephone about Franckowiak's PIP. Lethcoe Dep. 53:6-8. According to Lethcoe, Bard said "he didn't feel like [Franckowiak] was going to be successful with his PIP." Lethcoe Dep. 53:9-13. Lethcoe understood that, at the time of his conversation with Bard, Franckowiak's PIP was still in process, but he also believed that Franckowiak was "running out of time." Lethcoe Dep. 53:14-16. Lethcoe did not recall "the exact conversation" he had with Bard, but he believes that he and Bard "spent some time on the areas where [Franckowiak] had not been successful and where he had been asked to drive change or lead change, he wasn't successful." Lethcoe Dep. 53:17-21. Lethcoe testified that he and Bard "went through each of [the areas identified in the PIP] and [Bard] basically gave [him] an overview of the status." Lethcoe Dep. 53:22-54:2.

Lethcoe did not recall "any particular areas that [Franckowiak] had achieved or not achieved," and he did not take notes of the conversation. Lethcoe Dep. 54:3-7. During the conversation, Bard recommended that Franckowiak be terminated because he did not complete the PIP successfully. Lethcoe Dep. 54:13-18. Lethcoe and Bard did not discuss giving Franckowiak more time to improve. Lethcoe Dep. 54:19-22. Lethoce testified that "[i]t was somewhat black and white. You either do complete them successfully or you don't complete them successfully." Lethcoe Dep. 55:1-3. The conversation on Franckowiak's PIP and his status lasted "[m]aybe 15 minutes." Lethcoe Dep. 55:7-10.

Lethcoe testified that he and a Conagra human resources employee named Phil Pace had a discussion with Franckowiak by phone on February 3, 2015, to discuss his progress on the PIP. Lethcoe Dep. 72:3-18; *see also* Pace Dep. 33:16-35:14, ECF No. 37-19. Franckowiak, however, testified that he did not believe he ever spoke with Lethcoe about his PIP prior to his discharge. Pl.'s Dep. 351:8-11.

Lethcoe testified that after he and Pace spoke with Franckowiak over the phone about the progress of his PIP, Lethcoe, Pace, and Linville decided that they "would still move forward with the termination based on not successfully completing the PIP." Lethcoe Dep. 78:7-13. Lethcoe and Pace communicated the termination decision to Franckowiak in a meeting at the Womelsdorf Plant on February 5, 2015. Def.'s Facts ¶ 149.

**O.      The Maintenance Manager position after Franckowiak's discharge**

After Franckowiak was discharged, Jim Neiderer temporarily took over managing the maintenance department while retaining his responsibility for the maintenance department in Hanover. Def.'s Facts ¶ 155. Neiderer testified that at the time he took over maintenance at the Womelsdorf Plant, the facility lacked a comprehensive computerized maintenance program or inventory management system, was not tracking KPI metrics, and did not utilize a computerized, data-driven preventive maintenance program. Neiderer Aff. ¶ 4, ECF No. 37-20. Neiderer acknowledged, however, that the process of getting the Womelsdorf Plant onto a computerized preventive maintenance system had started before he arrived there. Neiderer Dep. 93:6-9, ECF No. 37-11. After Neiderer implemented the JDE CMMS at the Womelsdorf Plant, he hired a maintenance planner at the plant. Def.'s Facts ¶ 208. In Neiderer's opinion, it was the lack of a planner at the Womelsdorf Plant that was "one of the big holdups . . . of getting this [CMMS] system started" there. Neiderer Dep. 68:15-21.

Neiderer testified that when he learned of the scope of Franckowiak's duties he "thought it was a lot for one person to be doing." Neiderer Dep. 55:24-56:1. He further testified that, following Franckowiak's discharge, the position of maintenance manager at the Womelsdorf Plant was reduced in scope, although the position retained the same expectations and required qualifications regarding the use of a modern, computerized maintenance program. Neiderer Aff. ¶ 5. Ultimately, the duties that Franckowiak had performed by himself were split up and given to three newly hired employees. Pl.'s Facts ¶ 25.

13

Both Neiderer and Bard testified that they believe that Franckowiak's skill-set is more aligned with the duties and responsibilities of an hourly maintenance lead person position than with a maintenance manager position. Neiderer Aff. ¶ 6; Bard Dec. ¶ 53. But Neiderer also testified that he believed Franckowiak was capable of learning the computerized preventive maintenance system and that he believed Franckowiak could "get into the next level." Neiderer Dep. 62:3-8, 67:8-12. Bard testified that he "vaguely" recalled Neiderer telling him that Franckowiak was capable of doing what is necessary to implement the computerized system and that he did not disagree with Neiderer's assessment "at that time," although he was unable to recall when the discussion occurred. Bard Dep. 175:11-176:1.

### III. Standard of Review—Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

### IV. Franckowiak has presented sufficient evidence for a jury to find in his favor on his claim of age discrimination.

"The ADEA prohibits age discrimination in employment decisions against persons who are at least 40 years of age." *Kelly v. Drexel Univ.*, 94 F.3d 102, 104 (3d Cir. 1996) (citing 29 U.S.C. § 623(a)(1)). Under the *McDonnell Douglas* framework, the plaintiff must, first, make out a prima facie case of discrimination, after which "the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 974 and n.2 (3d Cir. 1998). "If the defendant provides this evidence, the burden shifts back to the plaintiff to demonstrate that the defendant's justification was a pretext for discriminatory animus." *Abels v. DISH Network Serv.*, LLC, 507 F. App'x 179, 183 (3d Cir. 2012).

#### A. A jury could find that Franckowiak has established a prima facie claim.

"Under the ADEA, a plaintiff can establish a prima facie case by demonstrating that (1) he is over forty, (2) he is qualified for the position in question, (3) he suffered from an adverse employment action, and (4) his replacement was sufficiently younger to permit a reasonable inference of age discrimination." *Reifinger v. Parkland Sch. Dist.*, 601 Fed. App'x. 138, 142 (3d

14

Cir. 2015). Conagra contends that Franckowiak was not qualified for the position of maintenance manager at Conagra and therefore fails to meet the second element of a prima facie claim.[15]

"[T]here is a low bar for establishing a prima facie case of employment discrimination." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006). Courts "determine a plaintiff's qualifications for purposes of proving a prima facie case by an objective standard." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). "'[W]hile objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to' consideration of whether the employer's nondiscriminatory reason for discharge is pretext." *Id.* (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)). "Thus, to deny the plaintiff an opportunity to move beyond the initial stage of establishing a prima facie case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria to determine whether their use was mere pretext." *Id.* (quoting *Weldon*, 896 F.2d at 798-99).

Conagra contends that at the time of Franckowiak's discharge he was not qualified to serve as maintenance manager for Conagra because he did not have the skills or knowledge necessary to: (1) implement a computerized maintenance management system, (2) implement a data-driven preventive maintenance program, (3) manage the maintenance department based on key performance indicators, and (4) demonstrate his ability be a "servant leader."

A reasonable jury could conclude otherwise. First, Franckowiak served as the maintenance manager of the Womelsdorf Plant for nearly thirty years before his discharge, not only when the plant was owned by a family business but also when it owned by Ralcorp, a large company. After Conagra acquired the plant, Franckowiak received a "consistently fulfills" rating in 2013, at which point Conagra had owned the plant for at least five months. In Franckowiak's July 2014 review, Bard noted that Franckowiak had his "full confidence," suggesting that he believed Franckowiak was capable of performing the job. In short, Franckowiak's long tenure as maintenance manager and competent performance ratings are sufficient to establish that he was qualified for the position. *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) (concluding that an employee was qualified for Quaker State sales representative when he "worked as a Quaker State sales representative for twenty-three years" and, "[d]uring his last five years on the job . . . received overall evaluations that translated into 'competent' by Quaker State's performance standards").

Moreover, the skills and knowledge identified by Conagra are not qualifications that are susceptible to objective assessment. *See Haqq v. Pennsylvania Dep't of Pub. Welfare*, No. CIVA 09-0042, 2010 WL 1253452, at *6 (E.D. Pa. Mar. 23, 2010) (observing that the determination of

---

[15] Conagra does not dispute that Franckowiak meet the other three elements of a prima facie claim.

whether a plaintiff in an employment discrimination case is qualified "[t]ypically . . . will take the form of some type of licensing requirement, such as a medical, law, or pilot's license, or an analogous requirement measured by an external or independent body rather than the court or the jury" (quoting *Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008))); *Gonzalez v. Passaic Cnty. Prob.*, No. 04–3001, 2005 WL 2077294, at *4 n. 5 (D.N.J. Aug. 25, 2005) ("[T]he 'qualified' prong of the prima facie case is more of a screening mechanism i.e., to weed out clear cut cases such as jobs requiring certain levels of educational degrees, licenses, etc., and any on the job performance evaluations are more appropriately considered in the pretext phase of the case."). In any event, there is competent evidence in the record from which a reasonable jury could conclude that Franckowiak possessed the skills and knowledge necessary to perform the duties of Conagra maintenance manager position, including the computer-based tasks identified by Conagra. In particular, Jim Neiderer, who served as the maintenance manager for Conagra's Hanover Plant, testified that he believed that Franckowiak was capable of learning the computerized preventive maintenance system and that Franckowiak could "get into the next level," Neiderer Dep. 62:3-8, 67:8-12. A reasonable jury could believe Neiderer's testimony and, based on this testimony, find that Franckowiak had the skills and knowledge to perform the job. Accordingly, because a reasonable jury could find that Franckowiak was qualified for the position, and because the remaining elements of a prima facie claim are not in dispute, Franckowiak has satisfied his burden at step one of the *McDonnell Douglas* framework.

**B.** **A jury could find that Conagra has articulated a legitimate, nondiscriminatory reason for Franckowiak's discharge.**

The defendant's burden at step two of the *McDonnell Douglas* framework "is relatively light: it is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1996) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

Conagra contends that it discharged Franckowiak due to his performance deficiencies. According to Conagra, "[a]t the end of [Franckowiak's] PIP, Conagra honestly believed that [he] has not shown sufficient progress during the PIP period" to remain in his position as maintenance manager. Def.'s Br. Supp. Summ. J. 18, ECF No. 37-3. This is a legitimate, nondiscriminatory reason for terminating Franckowiak. *See Wooler v. Citizens Bank*, 274 Fed. App'x. 177, 180 (3d Cir. 2008) (determining that poor performance is a legitimate, nondiscriminatory reason to fire an employee). Thus, Conagra has met step two of the *McDonnell Douglas* framework.

**C.** **A jury could find that Conagra's explanation is pretextual.**

Once a defendant has satisfied step two of the *McDonnell Douglas* framework, the plaintiff can survive summary judgment only "by submitting evidence that allows a fact finder to

either 1) disbelieve or discredit the employer's justification; or 2) believe discrimination was more likely than not a 'but for' cause of the adverse employment action." *Abels*, 507 F. App'x at 183.

Conagra contends that there is no evidence in the record from which a reasonable jury could find that age discrimination was a "but for" cause of Franckowiak's discharge. In particular, with respect to the alleged comments by Bard that Franckowiak and Rightmyer were "old dinosaurs" whom he sought to discharge by requiring them to complete impossible PIPs, Conagra contends that even if Bard made these comments (which both he and Hetrich deny), the comments are not evidence that Conagra's reasons for discharging Franckowiak were a pretext for age discrimination. First, Conagra points out that Rightmyer was not terminated and that Livinghouse acknowledged that Rightmyer's PIP did not contain impossible requirements. Second, Conagra contends that the alleged comments were made at least two months before the implementation of Franckowiak's PIP, and Linville independently reviewed his PIP for reasonableness. Third, Conagra asserts that Franckowiak's PIP "merely incorporated expectations required of all Conagra maintenance managers and therefore could not have been created to set up [Franckowiak] for failure." Def.'s Br. Supp. Summ. J. 20. Finally, Conagra contends that the context of the alleged "old dinosaur" comment shows that, if the comment was made, it related to the outmoded manner in which Franckowiak and Rightmyer performed their duties, rather than their age.

There is evidence in the record from which a reasonable jury could disagree with Conagra's assessment of Bard's alleged comments and find that the comments do support a finding that Franckowiak was discharged because of his age. First, the fact that Rightmyer was not terminated does not necessarily mean that a factor other than age motivated the decision to terminate Franckowiak. As discussed above, there is evidence in the record that Rightmyer was able to preserve his job because of Livinghouse's "tooth and [nail]" efforts on his behalf. Moreover, it is undisputed that Bard had significantly more control over the implementation of Franckowiak's PIP than he did Rightmyer's, and a reasonable jury could believe that he therefore had a greater opportunity to carry out his alleged plans to impose impossible requirements.

With respect to Linville's oversight of the Franckowiak's PIP, a reasonable jury could find that her participation was minimal, such that she might not have been able to detect whether the PIP imposed impossible requirements or whether Bard's implementation of the PIP and ultimate assessment of Franckowiak's progress were unfairly stringent.

Third, even if the PIP contained expectations required of all Conagra maintenance managers, a reasonable jury could find that Franckowiak was not provided sufficient time, training, and resources to accomplish the goals of the PIP. Jim Neiderer, for example, testified that he "knew [Franckowiak] needed some help" with implementing a CMMS system and, in particular, stated that the lack of a maintenance planner at the Womelsdorf Plant was "one of the big holdups" in implementing the system there. Neiderer Dep. 53:20-54:2, 68:15-21. For this

reason, he specifically recommended that the Womelsdorf Plant hire a maintenance planner, as existed at the Hanover Plant, and he played a role in hiring a maintenance planner for the Womelsdorf Plant after taking over the maintenance duties there. Neiderer also acknowledged that he thought Franckowiak's workload at the Womelsdorf Plant "was a lot for one person to be doing" and that the scope of the position was narrowed after Franckowiak's discharge.

Finally, a reasonable jury could find that Bard's alleged "old dinosaur" comment was evidence of age-related animus. *See Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1117 (3d Cir. 1997) ("[A]n inference of discrimination was evident in *Abrams*, given comments like 'things would hum around here when we got rid of the old fogies,' and the fact that two older employees were referred to as 'a dinosaur' and 'the old men.'" (citing *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1215 (3d Cir.1995))). In addition, a reasonable jury could find that Bard's alleged comment to Franckowiak about Bard's retirement could provide additional evidence that Bard acted out of a discriminatory motive. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 368 (3d Cir.), *order clarified*, 543 F.3d 178 (3d Cir. 2008) (observing that "stray remarks by decision-makers, which were unrelated to the decision-making process . . . could provide background evidence that may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive").

In short, for the reasons stated above, a reasonable jury could find that Franckowiak was discharged because of his age.

## V.     Conclusion

For the reasons set forth above, Conagra's motion for summary judgment is denied. A separate order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge